UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------
AADAM YUSUF,

        Petitioner,

    v.

JOHN COLVIN, *Superintendent, Five Points Correctional Facility*, and ANTHONY J. ANNUCCI, *Acting Commissioner, New York State Department of Corrections and Community Supervision*,

        Respondents.
---------------------------------------------------------------

**<u>MEMORANDUM & ORDER</u>**
18-CV-3360 (MKB)

MARGO K. BRODIE, United States District Judge:

  Petitioner Aadam Yusuf, proceeding pro se and currently incarcerated at Five Points

Correctional Facility ("FPCF") in Romulus, New York, brings the above-captioned habeas

corpus petition pursuant to 28 U.S.C. § 2254, alleging that he is being held in state custody in

violation of his federal constitutional rights. (Pet. 48, Docket Entry No. 1.)[1] Petitioner's claims

arise from a judgment of conviction in the Supreme Court of New York State, Nassau County

(the "Trial Court"), on charges of robbery in the first degree, robbery in the second degree,

burglary in the first degree, and conspiracy in the fourth degree.

  Petitioner seeks a writ of habeas corpus on the following grounds: (1) trial counsel was

ineffective for failing to protest a statement Petitioner made to Queens County detectives as

unnoticed under New York Criminal Procedure Law ("CPL") § 710.30; (2) the prosecution

withheld notice of the statement and then "ambush[ed]" Petitioner with a *Molineux* motion; (3)

---

[1]  The Court refers to the continuous pagination of the record assigned by the Electronic Court Filing ("ECF") system.

counsel was ineffective for failing to object appropriately to hearsay statements; (4) cell phone records were entered as testimonial evidence without proper foundation and in violation of the Confrontation Clause, and defense counsel was ineffective for not objecting to their admission on that basis; (5) Petitioner was punished for exercising his right to trial, and the trial court was biased; (6) the trial court erred in refusing to charge the jury with lesser-included offenses based upon the affirmative defense of inoperable weapons, and defense counsel did not adequately handle that defense; (7) the indictment was defective, and counsel was ineffective for not challenging the indictment as defective; and (8) appellate counsel was ineffective for failing to claim that Petitioner's trial counsel was ineffective and for failing to raise Petitioner's present claims.  (*See id.* at 6–47.)

For the reasons discussed below, because Petitioner failed to file the petition within the time period allowed by the applicable statute of limitations, *see* 28 U.S.C. § 2244(d)(1)(A), the Court grants Respondents' motion to dismiss.  (Resp't's Mot. to Dismiss ("Resp't's Mot."), Docket Entry No. 10.)  As further explained below, even if the petition were timely, it nevertheless would not entitle Petitioner to federal habeas relief because each of his claims fails on its merits.

## I.   Background

### a.   Factual background

Petitioner served as the get-away driver for a robbery in Nassau County on November 19, 2010.  (Aff. of Andrea M. DiGregorio in Opp'n to Pet. ("DiGregorio Aff.")  ¶ 5, at 3976–77, Docket Entry No. 30.)  Using a ruse of flower delivery, four of Petitioner's co-defendants forced their way into the residence.  (*Id.*)  Two of the co-defendants possessed firearms.  (*Id.*)  Petitioner and a fifth co-defendant waited nearby in Petitioner's vehicle.  (*Id.*)  The four co-defendants stole

jewelry and money and used duct tape to bind the limbs of one of the robbery victims before fleeing. (*Id.*)

Nassau County police arrested Petitioner the same day of the robbery. (*Id.* ¶ 6, at 3977.) In a statement to police, Petitioner acknowledged that he had driven three individuals — only one of whom Petitioner admitted to knowing — in Petitioner's vehicle to a house on Long Island, picking up a fourth person along the way. (*Id.*) Petitioner admitted that one person who approached the house explained that he was going to the house in order to "get the money." (*Id.*) Petitioner stated that he and the individual he admitted knowing remained in Petitioner's vehicle while the others entered the home. (*Id.*)

Police searched Petitioner's vehicle and found a roll of duct tape with Petitioner's palm print. (*Id.* ¶ 7, at 3977.) Security footage from the residence showed Petitioner walking in front of the house at the time of the robbery. (*Id.*)

After making a statement to Nassau County police, detectives from Queens County interviewed Petitioner about a burglary in Queens eleven days earlier in which the victim was related to the victim in the Nassau burglary. (*Id.* ¶ 8, at 3977.) Petitioner admitted to the Queens detectives that he had dropped off two of his co-defendants at the Queens residence where they proceeded to commit the burglary, that they returned from the house and reentered Petitioner's vehicle holding a bag, that one of the individuals announced "it's payday" after handing Petitioner $1,000, and that Petitioner drove two of the individuals home and the remaining one to work (the "Queens County Statement"). (*Id.* ¶ 9, at 3977–78.)

### b. Procedural history

On December 6, 2010, a grand jury in Nassau County indicted Petitioner and his codefendants on the following charges: two counts of robbery in the first degree in violation of New York Penal Law § 160.15(4) (Counts One and Two), one count of robbery in the second

degree in violation of New York Penal Law § 160.10(1) (Count Three), one count of burglary in the first degree in violation of New York Penal Law § 140.30(1) (Count Four), one count of burglary in the first degree in violation of New York Penal Law § 140.30(4) (Count Five), and one count of conspiracy in the fourth degree in violation of New York Penal Law § 105.10(1) (Count Six).  (Direct App. R. 2135–37, Docket Entry No 14.)

On January 31, 2012, a jury found Petitioner guilty on Counts One, Three, Four, and Six, and not guilty on Counts Two and Five.  (Direct App. R. 3834–35, Docket Entry No. 14-2.)  On March 2, 2012, the Trial Court sentenced Petitioner to concurrent terms of imprisonment totaling twenty-two years followed by concurrent terms of post-release supervision totaling five years. (Direct App. R. 2129–30, Docket Entry No. 14.)

Petitioner's counsel filed a notice of appeal on the same day of his sentencing.  (Notice of Appeal 570, Docket Entry No. 10-1.)  On March 20, 2013, the Supreme Court of New York, Appellate Division, Second Department ("Appellate Division") affirmed Petitioner's convictions.  *People v. Yusuf*, 961 N.Y.S.2d 316, 317 (App. Div. 2013).  On May 8, 2013, counsel on behalf of Petitioner requested leave to appeal to the New York Court of Appeals ("Court of Appeals").  (Appl. for Leave to Appeal 678, Docket Entry No. 10-4.)  On July 3, 2013, the Court of Appeals denied leave to appeal.  *See People v. Yusuf*, 21 N.Y.3d 1021 (2013).  Petitioner did not petition the U.S. Supreme Court for a writ of certiorari.  (DiGregorio Aff. ¶ 16, at 553–54; Pet. 2.)

On November 23, 2013, Petitioner placed in the prison mail system a pro se motion[2] to vacate his judgment pursuant to CPL § 440.  (Pet'r's Aff. of Service of Post-Conviction Mot. 1050, Docket Entry No. 11-2.)  By order dated December 3, 2015, the Trial Court denied Petitioner's motion in its entirety.  (Order Denying Post-Conviction Mot. 1214, Docket Entry No. 11-6.)

On December 17, 2015, Petitioner placed in the prison mail system a pro se motion[3] for leave to appeal to the Appellate Division.  (Pet'r's Aff. of Service of Leave to Appeal Post-Conviction Mot. 707, Docket Entry No. 11.)  On May 26, 2016, the Appellate Division denied leave to appeal.  (App. Div. Order Denying Leave to Appeal Post-Conviction Mot. 1228, Docket Entry No. 12-1.)

On January 6, 2016, Petitioner placed in the prison mail system a pro se petition[4] to the Appellate Division for a writ of error *coram nobis*.  (Pet'r's Aff. of Service for *Coram Nobis* Pet. 1230, Docket Entry No. 12-2.)  On September 14, 2016, the Appellate Division denied the

---

[2]  Petitioner's motion itself is dated November 7, 2013, (Pet'r's Post-Conviction Mot. 726, 729, 772, Docket Entry No. 11-1), and the accompanying memorandum of law is dated November 2, 2013, (Pet'r's Br. for Post-Conviction Mot. 826, Docket Entry No. 11-1).

[3]  The cover letter accompanying this motion and the notice of application for leave to appeal are both dated December 10, 2015.  (Pet'r's Cover Letter 706, Docket Entry No. 11; Pet'r's Notice of App. for Leave to Appeal 709, Docket Entry No. 11.)  Petitioner's supporting affidavit contains a blank space for the date into which December 17, 2015, is hand-written. (Pet'r's Aff. in Supp. 720, Docket Entry No. 11.)

[4]  The cover letter accompanying the petition is dated December 17, 2015.  (Pet'r's Cover Letter 1229, Docket Entry No. 12-2.)  The Notice of Motion contains a blank space for the date into which January 6, 2016, is hand-written.  (Pet'r's Notice of Mot. for *Coram Nobis* 1232, Docket Entry No. 12-2.)  Petitioner's affidavit in support contains a blank space for the date in which December 18, 2015, is hand-written.  (Pet'r's Aff. in Supp. of *Coram Nobis* Pet. 1276, Docket Entry No. 12-2.)  The accompanying memorandum of law contains a blank space for the date in which January 6, 2016, is hand-written.  (Pet'r's *Coram Nobis* Br. 1326, Docket Entry No. 12-3.)

petition.  *People v. Yusuf*, 37 N.Y.S.3d 454 (App. Div. 2016).  On October 3, 2016, Petitioner

deposited in the prison mail system a pro se motion[5] for leave to appeal to the Court of Appeals.

(Pet'r's Aff. of Service for Mot. for Leave to Appeal *Coram Nobis* Pet. 2101, Docket Entry No.

13-2.)  On January 4, 2017, the Court of Appeals denied leave to appeal.  *People v. Yusuf*, 28

N.Y.3d 1151 (2017).

      On May 18, 2018, Petitioner deposited in the prison mail system the pro se petition to the

Court for a writ of habeas corpus.  (Aff. of Service of Federal Pet. for Habeas Corpus 49, Docket

Entry No. 1.)  On July 31, 2018, Respondents moved to dismiss the petition as untimely.

(Resp't's Notice of Mot. to Dismiss 547, Docket Entry No. 10.)

      **b.  Service of the Appellate Division's May 26, 2016 Decision**

      In response to Respondents' motion to dismiss, Petitioner contends that he is entitled to

equitable tolling because he never received the Appellate Division's May 26, 2016 decision (the

"Missing Order"[6]) denying leave to appeal the Trial Court's denial of his post-conviction motion

to vacate judgment.  (Pet'r's Decl. in Opp'n to Mot. to Dismiss 3861–62, Docket Entry No. 18.)

In support, Petitioner produces a log of legal mail received at FPCF — where he is incarcerated

— which shows that: (1) the only legal mail he received during the relevant time period was a

letter from the New York Attorney General's Office on June 20, 2016, and (2) Petitioner received

no mail from the Appellate Division during the relevant time period.  (Prison Legal Mail Logs

---

[5]  Petitioner's motion contained a blank space in which October 3, 2016, is hand-written.
(Pet'r's Mot. for Leave to Appeal *Coram Nobis* Pet. 2102, Docket Entry No. 13-2.)

[6]  The Court defines the order as a "Missing Order" based on Petitioner's claim, even
though the Appellate Division issued the order, (Appellate Division Order Denying Leave to
Appeal Post-Conviction Mot. 1228, Docket Entry No. 12-1), the court's clerk's office sent
Petitioner a copy of this order, (Letter from Aprilanne Agostino, App. Div., to Amanda Manning,
Nassau Cnty. Dist. Att'y's Office (Oct. 26, 2018), at 3928, Docket Entry No. 21), and
prosecutors received their copy of the order, (Aff. of Margaret Mathis ¶ 3, at 3936–37, Docket
Entry No. 21).

3885–86, Docket Entry No. 18.)  Petitioner further contends that he sent two letters (the "Inquiry

Letters") to the Appellate Division — dated October 9, 2016 and September 13, 2017,

respectively — asking about the status of his motion for leave to appeal and asking for a copy of

any decision if one had been made, but that he never heard back.  (Letter from Pet'r to Appellate

Division (Sept. 13, 2017), at 3873–74, Docket Entry No. 18; Letter from Pet'r to Appellate

Division (Oct. 9, 2016), at 3875–76, Docket Entry No. 18.)

 Respondents dispute Petitioner's assertion.  First, Respondents cite a letter from the Clerk

of the Appellate Division explaining that, beyond Petitioner's initial application for leave to

appeal, the Appellate Division had "no record of any further correspondence being received by

[the Appellate Division] from [Petitioner] in connection with this matter."  (Letter from

Aprilanne Agostino, App. Div., to Amanda Manning, Nassau Cnty. Dist. Att'y's Office (Oct. 26,

2018), at 3928, Docket Entry No. 21.)  Second, Respondents point to a letter and emails from

FPCF officials in response to a FOIL request explaining that the prison keeps a log of inmates'

outgoing legal mail but that the log contains no entries showing that Petitioner sent any mail to

the Appellate Division after December of 2015.  (Letter from Nichole Crane, FPCF, to Amanda

Manning, Nassau Cnty. Dist. Att'y's Office (Jan. 15, 2019), at 3954, Docket Entry No. 25;

Emails Between Amanda Manning, Nassau Cnty. Dist. Att'y's Off. & Nichole Crane, FPCF (Jan.

15, 2019), at 3956, Docket Entry No. 25.)

## II. Discussion

### a. Standard of review

 To obtain federal *habeas* relief, a petitioner must show that the state court decision,

having been "adjudicated on the merits in State court proceedings," is either "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013). "Courts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether [the] deference [required by subsection (d)] applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (citing 28 U.S.C. § 2254(a)). The Court opts to review Petitioner's claims *de novo*.

### b.   The petition is untimely

Respondents move to dismiss the petition as having been filed outside the applicable statute of limitations.

Petitioner contends that he is entitled to equitable tolling making the petition timely. Because more than a year of countable time accumulated towards the statute of limitations before Petitioner filed his federal habeas petition, and because Petitioner has not established his entitlement to equitable tolling, the Court grants Respondents' motion and dismisses the petition.

### i.   Beginning of the statute of limitations

With the passage of Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress set a one-year statute of limitations within which a person in custody pursuant to a state court conviction may file a petition for a writ of habeas corpus. 28 U.S.C. § 2244(d)(1). The one-year period runs from the date on which the latest of four events occurs:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United

States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D); *see also Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (interpreting section 2244 to apply "to the general run of habeas cases . . . when those cases had been filed after the date of the [AEDPA]"); *Francis v. Comm'r of Corr.*, 827 F. App'x 129, 130 (2d Cir. 2020) ("[T]he statute of limitations applicable to habeas petitions is one year from 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.'" (quoting 28 U.S.C. § 2254(d)(1)(A))); *Favourite v. Colvin*, 758 F. App'x 68, 69 (2d Cir. 2018) ("The [AEDPA] imposes a one-year statute of limitations for filing a habeas corpus petition, which begins to run following . . . 'the date on which the judgment became final.'" (quoting 28 U.S.C. § 2244(d)(1)(A))).  A judgment of conviction is "final" under 28 U.S.C. § 2244(d)(1)(A) when a defendant's direct appeal in the respective state's highest court is complete and either proceedings before the United States Supreme Court are complete, if the petitioner chooses to file for a writ of certiorari, or the time expires to seek certiorari before the United States Supreme Court.  *McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003); *see also Williams v. Artuz*, 237 F.3d 147, 150–51 (2d Cir. 2001) (holding that a petitioner's judgment of conviction becomes final ninety days from the date the New York Court of Appeals denies leave to appeal); *Smith v. McIntosh*, No. 20-CV-4535, 2021 WL 123360, at *2 (E.D.N.Y. Jan. 13, 2021) (same).

This includes the period for petitioning the U.S. Supreme Court for a writ of certiorari. *See Rivera v. Warden, Clinton Corr. Facility*, 590 F. App'x 93, 94 n.2 (2d Cir. 2015) (citing *Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001)). When a petitioner in New York receives a decision from the Court of Appeals and does not petition the U.S. Supreme Court for a writ of certiorari, the petitioner's judgment becomes final ninety days after the Court of Appeals issues its decision. *See Davis v. Lempke*, 767 F. App'x 151, 152 (2d Cir. 2019) (citing *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998).

On July 3, 2013, the Court of Appeals denied Petitioner's motion for leave to appeal the Appellate Division's judgment on direct appeal. Petitioner did not petition the U.S. Supreme Court for a writ of certiorari. Therefore, the ninety-day period for seeking certiorari expired on October 1, 2013. Accordingly, Petitioner's conviction became final — and the statute of limitations began to run — on that date.

### ii. Statutory tolling of the statute of limitations

Because the time during which Petitioner petitioned the state courts for post-conviction relief and the pendency of those actions are excluded from the limitation period, the statute of limitations did not expire exactly one year after October 1, 2013.

"The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). In New York, this includes post-conviction motions pursuant to CPL § 440 and petitions in the Appellate Division for writs of error *coram nobis*. *See Davis*, 767 F. App'x at 152 (*coram nobis*); *Pratt v. Greiner*, 306 F.3d 1190, 1191 (2d Cir. 2002) (article 440). However, filing a post-conviction motion does not re-start the one-year statute of limitations period. Rather, the tolling provision

under section 2244(d)(2) merely excludes the amount of time a post-conviction motion is under submission from the calculation of the one-year statute of limitations. *Saunders v. Senkowski*, 587 F.3d 543, 548 (2d Cir. 2009) (per curiam) (noting that a section 440.10 motion is "pending" beginning on the day it is filed and ending when it is disposed of); *Doe v. Menefee*, 391 F.3d 147, 154 (2d Cir. 2004) (noting that a state collateral proceeding commenced after the limitations period has run does not restart the limitations period); *Smith v. McGinnis*, 208 F.3d 13, 16 (2d Cir. 2000).

A motion or petition becomes "pending" for purposes of 28 U.S.C. § 2244(d)(2) when it is filed. *See Saunders*, 587 F.3d at 549. When an incarcerated, pro se petitioner in New York petitions for a writ of error *coram nobis* or moves pursuant to CPL § 440 to vacate a criminal judgment, the filing date of such a petition or motion is the date on which the petitioner delivers the relevant papers to prison officials for mailing, even if the state courts receive the filing later. *See Joseph v. Conway*, 567 F. App'x 56, 58 (2d Cir. 2014) ("We have extended the prison mailbox rule to apply to prisoner's filings of *coram nobis* petitions." (citing *Fernandez v. Artus*, 402 F.3d 111, 112 (2d Cir. 2005))); *Garcia v. Lamanna*, No. 18-CV-5454, 2019 U.S. Dist. LEXIS 202462, at *16–20 (S.D.N.Y. Nov. 20, 2019) (applying prison mailbox rule to determine filing date of incarcerated pro se petitioner's section 440.10 motion); *Jackson v. Graham*, No. 16-CV-9595, 2018 U.S. Dist. LEXIS 213927, at *8 n.4 (S.D.N.Y. Dec. 18, 2018) (same), *report and recommendation adopted*, 2019 U.S. Dist. LEXIS 137258 (S.D.N.Y. Aug. 14, 2019). Tolling begins on the filing date — that is, the filing date is itself excluded from the time accumulated towards the statute of limitations. *See Chrysler v. Guiney*, 14 F. Supp. 3d 418, 443 (S.D.N.Y. 2014), *aff'd*, 806 F.3d 104 (2d Cir. 2015).

Such state court proceedings remain pending — and therefore continue tolling the federal

statute of limitations — until the conclusion of all avenues of state court appellate review. *See Carey v. Saffold*, 536 U.S. 214, 219–20 (2002). For a post-conviction motion pursuant to CPL § 440 initially presented to the state court, the tolling ends when the Appellate Division denies leave to appeal. *See Belot v. Burge*, 490 F.3d 201, 204 (2d Cir. 2007) ("[The] Appellate Division . . . denied [the petitioner's] application for leave to appeal the denial [of his section 440.10 motion] on September 18, 2002. At that point, his limitation period began again to run."); *Chrysler*, 14 F. Supp. 3d at 442 ("AEDPA's one year statute of limitations is tolled from the date a petitioner files his or her 440.10 motion until the date the Appellate Division denies the petitioner leave to appeal that decision." (quoting *Wilkins v. Kirkpatrick*, No. 06-CV-2151, 2009 WL 3644082, at *7 (S.D.N.Y. Nov. 4, 2009))). For a *coram nobis* petition initially presented to the Appellate Division, the tolling ends when the Court of Appeals denies leave to appeal. *See Saunders*, 587 F.3d at 547–48 ("[S]tatutory tolling for the purposes of AEDPA ends with the 'filing' of the state court's final order . . . ." (quoting *Geraci v. Senkowski*, 211 F.3d 6, 9 (2d Cir. 2000))); *Blair v. Heath*, No. 12-CV-1001, 2013 WL 5988934, at *2 (S.D.N.Y. Nov. 8, 2013) (explaining that, in 2002, "the New York State legislature granted criminal defendants the ability to appeal [the denial of a writ of error *coram nobis*] to the New York Court of Appeals. Thus, the limitation period . . . was properly tolled until the Court of Appeals . . . denied [the] petitioner leave to appeal the denial of his *coram nobis* application." (citations omitted)). Tolling ends on the date on which the final state court issues its decision — that is, the date of decision is itself excluded from the time accumulated towards the statute of limitations. *See Chrysler*, 14 F. Supp. 3d at 443.

Petitioner's federal habeas petition is untimely because more than a year of countable time accumulated towards the statute of limitations, even when accounting for the statutory tolling that resulted from Petitioner's post-conviction proceedings in state court.

Time began accumulating against the federal statute of limitations on October 1, 2013, ninety days after July 3, 2013, the date the Court of Appeals denied Petitioner's motion for leave to appeal the Appellate Division's judgment on direct appeal, because Petitioner did not petition the U.S. Supreme Court for a writ of certiorari.  From October 1, 2013 to November 23, 2013, inclusive of the first date but exclusive of the last date, fifty-three days accumulated against the statute of limitations before the first statutory tolling event occurred.  On November 23, 2013, Petitioner's motion under CPL § 440 began tolling the statute of limitations, and the statutory tolling continued through the Trial Court's December 3, 2015 decision denying the motion and Petitioner's December 17, 2015 motion for leave to appeal to the Appellate Division, and continued tolling up to and including the Appellate Division's issuance of the Missing Order denying leave to appeal on May 26, 2016.[7]

On January 6, 2016, before the above-described period of statutory tolling ended, Petitioner's petition for a writ of error *coram nobis* began separately tolling the statute of limitations.  Statutory tolling due to the *coram nobis* petition continued through the Appellate Division's denial of the petition on September 14, 2016, and Petitioner's October 3, 2016 motion

---

[7]  Petitioner argues that this post-conviction proceeding should be considered pending — and therefore continue tolling the statute of limitations until Petitioner received the Missing Order from Respondents as part of their motion to dismiss.  The Court disagrees.  While the *equitable* tolling analysis must take into account Petitioner's allegation that he never received notice of the Appellate Division's decision, *see* Part II.c, *infra*, the relevant date for *statutory* tolling is the date on which a state court files its order, not the date on which a Petitioner receives notice of that order.  *See Saunders*, 587 F.3d at 549.

for leave to appeal to the Court of Appeals, and continued tolling up to and including the Court of Appeals' decision to deny leave to appeal on January 4, 2017.

Combined, Petitioner's state court proceedings tolled the statute of limitations starting November 23, 2013 and ending January 4, 2017, inclusive of both dates. There were no other periods of statutory tolling. Accordingly, every day after, but not including, January 4, 2017, counts towards the statute of limitations, as does the fifty-three days from October 1, 2013 to November 23, 2013, inclusive of the first date but exclusive of the last date. When Petitioner filed his federal habeas petition on May 18, 2018,[8] the countable time accumulated toward the one-year statute of limitations was 552 days — the 53 days preceding the start of Petitioner's first state court post-conviction proceeding and the 499 days following the end of Petitioner's last state court post-conviction proceeding. Because this far exceeds the one-year period allowed for filing a federal habeas petition, the statute of limitations bars the petition unless Petitioner can demonstrate that there is a basis for the application of equitable tolling, which the Court next addresses.

### iii. Equitable Tolling

Petitioner contends that the petition is timely because he is entitled to equitable tolling for all but the first fifty-three days of countable time.[9] He asserts that prior to filing his federal

---

[8] By virtue of the prison mailbox rule, the petition is deemed filed when Petitioner handed it to prison officials for mailing on May 18, 2018. *See Hardy v. Conway*, 162 F. App'x 61, 62 (2d Cir. 2006); *see also* Rule 3(d); Rules Gov'g § 2254 Cases in the U.S. Dist. Cts. ("A paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing.").

[9] Petitioner also makes a passing reference to "equitable estoppel." (Pet'r's Decl. for Mot. to Dismiss 3865, Docket Entry No. 18.) The Court assumes this is an error and that Petitioner intended to write "equitable tolling." To the extent Petitioner intended to raise an issue of equitable estoppel, the Court finds Petitioner's argument unpersuasive. Petitioner could

habeas petition (1) he never received notice of the Missing Order, and (2) he diligently attempted to learn the status of his state court litigation when he did not hear from the Appellate Division. The Court credits Petitioner's first assertion but finds that he has failed to demonstrate the exercise of due diligence, which defeats his request for equitable tolling.

The one-year statute of limitations governing federal habeas petitions, *see* 28 U.S.C. § 2244(d), "is subject to equitable tolling in appropriate cases." *Holland v. Florida*, 560 U.S. 631, 645 (2010). "To be entitled to equitable tolling, [a habeas petitioner] must show '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). "[A] litigant seeking equitable tolling bears the burden of establishing" both elements. *Pace*, 544 U.S. at 418. "[C]ourts do not apply [these] requirements mechanistically. Rather, the exercise of a court's equity powers must be made on a case-by-case basis, mindful that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case." *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011) (internal citations omitted).

### 1. Extraordinary circumstances

The "extraordinary circumstances" warranting equitable tolling will be both "rare" and "exceptional." *Martinez v. Superintendent, E. Corr. Facility*, 806 F.3d 27, 31 (2d Cir. 2015). "When determining what constitutes 'extraordinary' circumstances, . . . 'the proper inquiry is not

---

avail himself of equitable estoppel only if he reasonably relied on Respondents' material representation, resulting in a serious injustice due to serious governmental misconduct. *See Schwebel v. Crandall*, 967 F.3d 96, 102 (2d Cir. 2020). Petitioner has not shown that Respondents made any representations to him, that he relied on any representations they did make, that his reliance was reasonable, that a serious injustice has resulted, or that Respondents have committed serious misconduct.

how unusual the circumstance alleged to warrant tolling is among the universe of prisoners, but rather how severe an obstacle it is for the prisoner endeavoring to comply with [the statute of] limitations period.'" *United States v. Wright*, 945 F.3d 677, 684 (2d Cir. 2019) (quoting *Diaz v. Kelly*, 515 F.3d 149, 154 (2d Cir. 2008)).

"[A] state court's failure to send notice within a reasonable time after entry of an order completing a prisoner's collateral attack can provide a basis for equitable tolling." *Diaz*, 515 F.3d at 155.  However, such a delay constitutes an extraordinary circumstance only to the extent the delay itself is extraordinary. *Saunders*, 587 F.3d at 550 (2d Cir. 2009).  A "delay . . . between the filing of the order and its mailing to the petitioner [of] several months" warrants equitable tolling, but "a delay occasioned by the normal course of the mail, as lengthened by a regularly scheduled holiday," does not. *Id.*  Whatever the cause, days-long delays do not constitute extraordinary circumstances. *See Simmons v. Brown*, No. 08-CV-1425, 2011 WL 2133844, at *11 (E.D.N.Y. May 26, 2011) (eight days); *Moon v. Rock*, No. 07-CV-5026, 2008 WL 5272469, at *3–4 (E.D.N.Y. Dec. 15, 2008) (four days).  On the other hand, months-long delays constitute sufficiently rare, exceptional, and severe obstacles to qualify. *See Favourite*, 758 F. App'x at 70 (three months); *Diaz*, 515 F.3d at 152 (seven months).  An "unexplained [thirty-six]-day delay" falls "between these two extremes but far closer to" a normal delay than an extraordinary one, and therefore does "not entitle [a petitioner] to equitable tolling." *Taylor v. Racette*, 709 F. App'x 105, 106 (2d Cir. 2018).

The Court finds the existence of extraordinary circumstances in Petitioner's case because the Court credits Petitioner's assertion that he never received the Missing Order.  The FPCF legal mail logs show that Petitioner only received one item of legal mail during the relevant period, which was a letter from the New York Attorney General's office.  (Prison Legal Mail Logs 3885–

86.)  In addition, Petitioner asserted in his first filing — before the timeliness of his petition was raised as an issue — that he never received the Missing Order.  (Pet. 5.)

The Court does not find Respondent's arguments to be persuasive.  Respondents point to the letter from the Clerk of the Appellate Division, explaining that she had "no reason to doubt that" the Appellate Division in fact mailed a copy of its Missing Order to Petitioner at FPCF, consistent with the court's standard practice.  (Letter from Aprilanne Agostino, App. Div., to Amanda Manning, Nassau Cnty. Dist. Att'y's Office (Oct. 26, 2018), at 3928.)  While the Court credits the assertion, the Court also recognizes that postal delivery can encounter problems as can mail processing at prisons.  While the letter from the Clerk of the Appellate Division persuades the Court that the Appellate Division in fact mailed its order to Petitioner, the letter does not refute the likelihood that inadvertent bureaucratic error related to postal delivery or prison mail processing kept that order from reaching Petitioner.

Given that Petitioner never received the Missing Order from the Appellate Division, the delay in Petitioner's case lasted from the issuance of the order on May 26, 2016 to the late summer or early fall of 2018, when Petitioner learned of the Missing Order from reading Respondents' motion to dismiss his federal habeas petition.  This delay of over two years constitutes an extraordinary circumstance.

### 2.   Due diligence

"Even when extraordinary circumstances exist, however, a petitioner must demonstrate diligence to qualify for equitable tolling."  *Wright*, 945 F.3d at 685.  This requires "a party seeking equitable tolling [to] show diligent pursuit of his claim 'throughout the period he seeks to toll.'"  *Harper*, 648 F.3d at 136 (quoting *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007) (emphasis removed)).  "The diligence required for equitable tolling purposes is reasonable

diligence, not maximum feasible diligence." *Holland*, 560 U.S. at 653. However, due diligence

"demand[s] something more than . . . no diligence at all." *Johnson v. United States*, 544 U.S.

295, 309 (2005) (addressing the due diligence requirement of what is now codified at 28 U.S.C.

§ 2255(f)(4)). A petitioner seeking to demonstrate due diligence should be able to demonstrate

some level of inquiry into the relevant circumstances. *Holland*, 560 U.S. at 653 ("Here, [the

petitioner] not only wrote his attorney numerous letters seeking crucial information and

providing direction; he also repeatedly contacted the state courts, their clerks, and [state bar

authorities] in an effort to have [his court-appointed post-conviction attorney] — the central

impediment to the pursuit of his legal remedy — removed from his case.").

　　　When the extraordinary circumstance warranting equitable tolling is a state court's

unreasonably long delay in providing notice of that state court's decision, there is "no point in

obliging a *pro se* litigant to pester a state court with frequent inquiries as to whether a pending

motion has been decided, at least until a substantial period of time has elapsed." *Diaz*, 515 F.3d

at 155. However, when the substantial period of time passes, a petitioner must inquire of the

state court about the case's progress. *See id.* (suggesting that a "letter of inquiry filed sixteen

months after filing of [the] state court application does not satisfy diligence" (citing *Drew v.

Dep't of Corr.*, 297 F.3d 1278, 1287-88 (11th Cir. 2002))); *Plowden v. Romine*, 78 F. Supp. 2d

115, 119 (E.D.N.Y. 1999) ("[I]t was not reasonable for [the petitioner] to allow more than

seventeen months to elapse . . . ."). That said, a single, written inquiry to the state court in

question usually suffices to satisfy the due diligence obligation. *See Favourite*, 758 F. App'x at

70 (finding a single "written inquiry . . . over a year after [the petitioner] filed his motion and less

than two months after the limitations period expired" sufficient); *Diaz*, 515 F.3d at 155 (finding a

18

single "[written] inquiry . . . nine months after [the petitioner] had sought leave to appeal . . .
[and] slightly more than three months after the end of the limitations period" sufficient).

Petitioner contends that his two Inquiry Letters demonstrate the requisite due diligence.
The Court finds that, based on the evidence in the record, Petitioner fails to carry his burden of
demonstrating due diligence and therefore equitable tolling is not warranted.

FPCF's legal mail logs provide the most persuasive record evidence in this case. A letter
from one of FPCF's records access officers states that after "conduct[ing] a diligent search,"
FPCF officials were unable to locate "any responsive records" to Nassau County prosecutors'
request for "[c]opies of records that show the dates [Petitioner] sent out mail to the Appellate
Division, Second Department, beginning in December 2015 to the present." (Letter from
Nichole Crane, FPCF, to Amanda Manning, Nassau Cnty. Dist. Att'y's Office (Jan. 15, 2019), at
3954, Docket Entry No. 25.) In a follow-up e-mail, the FPCF records access officer responded
"Yes, that is correct" to prosecutors' inquiry, "To confirm my understanding, the Department [of
Corrections and Community Supervision, which oversees FPCF,] *does* keep a log or record of
the information that our Office requested, but in this case there are no relevant entries?" (E-
mails between Amanda Manning, Nassau Cnty. Dist. Att'y's Office, and Nichole Crane, FPCF
(Jan. 15, 2019), at 3956, Docket Entry No. 25.) The absence of relevant entries in FPCF's legal
mail logs raises significant doubts over whether Petitioner mailed the two Inquiry Letters to the
Appellate Division.

In addition, the letter from the Clerk of the Appellate Division submitted by Respondent
in its motion to dismiss the petition further undermines Petitioner's claim. The letter explains
that, beyond Petitioner's initial application for leave to appeal, the Appellate Division had "no
record of any correspondence being received by [the Appellate Division] from [Petitioner] in

19

connection with this matter." (Letter from Aprilanne Agostino, App. Div., to Amanda Manning, Nassau Cnty. Dist. Att'y's Office (Oct. 26, 2018), at 3928.) While the Court acknowledges the possibility that someone along the delivery pipeline — whether FPCF officials at the outset, U.S. Postal Service letter carriers in transit, or Appellate Division staff after delivery — may have misplaced Petitioner's two Inquiry Letters, it is less likely that *both* letters met such a fate, along with Petitioner's copy of the Missing Order, *despite* the fact that prosecutors received a copy of the Missing Order. As with FPCF's legal mail logs, this absence of a record of the Inquiry Letters in the Appellate Division's case files raises doubts over whether Petitioner mailed the two Inquiry letters to the Appellate Division.

The Court is mindful that "a litigant seeking equitable tolling bears the burden of establishing . . . that he has been pursuing his rights diligently." *Pace*, 544 U.S. at 418. The absence of records reflecting the Inquiry Letters in either the FPCF's legal mail logs or the Appellate Division's case file raises sufficient doubts about the Inquiry Letters such that the Court cannot conclude that Petitioner has carried his burden to demonstrate due diligence. The Court therefore denies Petitioner's request for equitable tolling.

However, even if the Court were to grant equitable tolling sufficient to make the petition timely, Petitioner is nevertheless not entitled to *habeas* relief based on the merits of his claims. The Court addresses each of Petitioner's claim below.

### c.   Noncompliance with state discovery rules

Petitioner contends that the Trial Court should have excluded the Queens County Statement from evidence in light of the prosecutors' failure to provide adequate notice of the statement as required by CPL § 710.30. In addition, Petitioner contends that his trial counsel provided ineffective assistance for failing to make this argument, and that his appellate counsel

provided ineffective assistance by failing to challenge trial counsel's ineffective assistance in failing to raise the same argument.  Because the underlying claim regarding exclusion is meritless, neither trial nor appellate counsel could have been ineffective for failing to raise meritless arguments.

Under New York law, prosecutors must notify a criminal defendant if they intend to introduce a statement the defendant made to police.  *See* CPL § 710.30(1).  They must provide that notice to the defendant "within fifteen days after arraignment and before trial," although a court may permit late notice "for good cause shown."  *Id.* § 710.30(2).  Prosecutors can show good cause in "instances where, given the time, place and context of the defendant's statement to a police officer and an attenuated connection between that officer and the prosecutor, the untimely disclosure of the statement to the prosecutor would present the 'unusual circumstances' to which the good cause requirement is addressed."  *People v. O'Doherty*, 70 N.Y.2d 479, 486 (1987).  Factors to consider include the complexity of the case as measured by the volume of evidence, the number of defendants, and the quantity of investigating agencies, as well as the weakness of the connection between the testifying officers and the prosecuting attorneys.  *See People v. Riley-James*, 563 N.Y.S.2d 894, 896 (App. Div. 1990); *see also People v. Herner*, 623 N.Y.S.2d 674, 676–77 (App. Div. 1995).

The Court is not persuaded by Petitioner's argument that CPL § 710.30 would have required the exclusion of the Queens County Statement because prosecutors possessed good cause for the failure to disclose.  First, Petitioner's case was complicated.  The six-count indictment charged six different defendants, including Petitioner.  (Direct App. R. 2135–37.)  It required seven days of pretrial hearings and eleven days of trial proceedings.  (Direct App. R. 2151–2613, 2644–3837.)  Prosecutors called twenty-two witnesses and introduced seventy-eight

exhibits at trial.  (Trial Tr. dated Jan. 13–31, 2012, at 3838–42, Docket Entry No. 14-2.)  The complicated nature of the case required the Trial Court to order severance for each defendant. (Direct App. R. 2150); *see Riley-James*, 563 N.Y.S.2d 894, 896 (finding case complex where "[s]ix defendants were brought to trial," "[a]t least five different agencies were involved," "[m]embers of each agency testified at trial," and "[a] considerable amount of physical evidence was involved, including over [sixty] items introduced by the People").

In addition, the lack of bureaucratic ties between the Queens detectives who testified about Petitioner's Queens County Statement and the Nassau County assistant district attorneys who prosecuted this case demonstrates the attenuated connection between those two groups.  The Queens detectives lacked a strong connection to Nassau County prosecutors because they were employed by the New York Police Department, an agency which lacked authority to investigate and make arrests for crimes occurring in Nassau County, the prosecuting jurisdiction.  (Direct App. R. 3591–92); *cf. People v. Fanelli*, 600 N.Y.S.2d 927, 928 (Richmond Cnty. Sup. Ct. 1993) (finding attenuated connection "where the statement in question was made several months earlier to a Federal officer not under the authority or control of the local prosecutor, in the course of an apparently unknown, unrelated Federal investigation being conducted in a distant state").  In addition, at the time the Queens detectives elicited the Queens County Statement from Petitioner, they were investigating a crime that occurred in Queens County and were not involved in the Nassau County investigation that eventually resulted in Petitioner's prosecution for the underlying charges in this case.  (Direct App. R. 3592–99); *see People v. Socia*, 568 N.Y.S.2d 864, 866 (Bronx Cnty. Sup. Ct. 1991) (finding attenuated connection between officers and prosecuting attorney where "witnesses to the statement were off-duty police officers who were

not included in any aspect of the investigation" and "there was absolutely no connection between these officers and the prosecuting attorney").

Thus, the circumstances of Petitioner's statement to the Queens detectives and the attenuated connection between those detectives and Nassau County prosecutors provide good cause to excuse prosecutors from timely complying with their obligations under CPL § 710.30(1). Because any motion pursuant to section 710.30(1) would have failed, trial counsel cannot have been ineffective for failing to raise the issue. Likewise, appellate counsel cannot have been ineffective for failing to argue that trial counsel should have raised the issue.

### d. *Miranda* **violation**

Petitioner argues that the Trial Court should have suppressed the Queens County Statement because the *Miranda* warnings Petitioner received from Nassau detectives did not carry over to the subsequent questioning performed by Queens detectives. In addition, Petitioner contends that his trial counsel provided ineffective assistance for failing to make this argument, and that his appellate counsel provided ineffective assistance by failing to raise this argument for ineffective assistance of trial counsel. Because the underlying claim regarding exclusion is without merit, neither trial nor appellate counsel could have been ineffective for failing to raise meritless arguments.

"Prior to questioning, a suspect 'must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). So-called "*Miranda* warnings" are required only for "custodial" interrogations. *Howes v. Fields*, 565 U.S. 499, 508–09 (2012).

23

When police conduct an initial interrogation following *Miranda* warnings, police need not provide additional *Miranda* warnings during a subsequent interrogation of the same subject "unless the circumstances changed so seriously that [the suspect's] answers no longer were voluntary, or unless [the suspect] no longer was making a 'knowing and intelligent relinquishment or abandonment' of [the suspect's] rights." *Wyrick v. Fields*, 459 U.S. 42, 47 (1982); *see also United States v. Martinez*, 916 F. Supp. 2d 334, 351 (E.D.N.Y. 2013) (recognizing *Fields* as the controlling authority "on the issue at hand: namely, whether a first and only *Miranda* warning would be sufficient to validate a second short-time later interview"). This doctrine applies even if police from one agency provide the initial *Miranda* warnings and conduct the initial interrogation and police from a different agency conduct a subsequent interrogation without providing new *Miranda* warnings. *See, e.g.*, *United States v. Banner*, 356 F.3d 478, 480 (2d Cir. 2004) (per curiam) ("It is well established that once an arrested person has received a proper *Miranda* warning, the fact that questioning is stopped and then later resumed does not necessarily give rise to the need for a new warning. We see no reason to think that the fact that the resumption of questioning is by agents of a different sovereign means that a new *Miranda* warning is required." (citations omitted)), *vacated on sentencing grounds*[10] *sub nom. Forbes v. United States*, 543 U.S. 1100 (2005); *United States v. James*, No. 10-CR-1293, 2011 WL 6306721, at *7 (S.D.N.Y. Dec. 16, 2011) ("[T]he fact that NYPD detectives issued the initial warnings and ATF agents conducted the subsequent interrogation is irrelevant . . . ."), *aff'd*, 520 F. App'x 41 (2d Cir. 2013); *United States ex rel. Mahler v. Perez*, No. 06-CV-5109, 2007 WL 1825403, at *8 (E.D.N.Y. June 21, 2007) ("[I]t was not erroneous for the Brooklyn detectives to

---

[10] Although the Supreme Court vacated *Banner* on sentencing grounds, courts in this circuit continue to rely on the Second Circuit's *Miranda* holding. *See, e.g.*, *Bridges v. Valley*, No. 10-CV-5950, 2011 WL 2708723, at *2 (E.D.N.Y. July 11, 2011).

rely on [a New York state police investigator]'s warnings, ask petitioner if she understood them, and then question her without a fresh warning."); *Plume v. Conway*, No. 05-CV-152, 2006 WL 1789134, at *5 (W.D.N.Y. June 27, 2006) ("[Q]uestioning by different sovereign entities does not require re-administration of *Miranda* warnings." (citing *Banner*, 346 F.3d at 480)).

Petitioner's *Miranda* claim fails.  After Nassau detectives issued *Miranda* warnings to Petitioner and conducted an interrogation, Queens detectives were not required to provide new *Miranda* warnings to Petitioner before they began questioning him.

Petitioner's reliance on New York caselaw to argue otherwise is misplaced.  (Pet. 8 (arguing that "Nassau County and Queens County . . . ha[d] a case where they were required to readminister [*Miranda*] warnings" (citing *People v. Alexander*, 882 N.Y.S.2d 473, 474–75 (App. Div. 2009))).  First, a state court decision cannot bind a federal Court on a question of federal law on federal *habeas* review.  Second, even if *Alexander* did bind the Court, the decision does not assist Petitioner.  In *Alexander*, Nassau County police illegally arrested the defendant and interrogated him in Nassau County about crimes committed in Nassau County.  *Alexander*, 882 N.Y.S.2d at 473–74.  After eleven hours, a Queens detective traveled to Nassau County to interrogate the defendant about robberies that occurred in Queens.  *Id.* at 473.  The Queens detective "administered fresh *Miranda* warnings and elicited a waiver" before interrogating the defendant, who subsequently made incriminating statements about the Queens robberies.  *Id.* at 473–74.  The Appellate Division held that the renewed *Miranda* warnings were one factor among several others leading that court to find the Queens detective's interrogation to be sufficiently attenuated from the illegality of the Nassau police's arrest.  *Id.* at 474–75.  *Alexander* does not hold that the Queens detective was required to provide *Miranda* warnings before interrogating the defendant.

Because Petitioner's *Miranda* claim fails, it cannot be the basis of federal *habeas* relief and cannot be the basis of a claim for ineffective assistance of either trial or appellate counsel. The Court therefore denies habeas relief on this ground.

**e.   Late disclosure and late ruling**

Petitioner claims that prosecutors provided untimely notice of the Queens County Statement which interfered with his trial counsel's ability to properly advise Petitioner on a pretrial plea offer which the Trial Court extended to Petitioner.  Petitioner also claims that his trial counsel was ineffective for failing to challenge the timeliness of the prosecutors' disclosure of the Queens County Statement, and that his appellate counsel was ineffective for failing to raise this argument concerning the ineffectiveness of Petitioner's trial counsel.  The Court is not persuaded by these claims.

First, the prosecutors' notification to Petitioner of the Queens County Statement was not untimely.  Prosecutors may seek to offer evidence of other, uncharged crimes — so-called *Molineux*[11] evidence — if "it is relevant to some material issue in the case and the trial court determines in its discretion that the probative value of the evidence outweighs the risk of undue prejudice to the defendant."  *People v. Frumusa*, 29 N.Y.3d 364, 369 (2017).  Before introducing this evidence at trial, "the prosecutor should ask for a ruling out of the presence of the jury at which the evidence to be produced can be detailed to the court," after which the court must "either admit or exclude it in total, or admit it without the prejudicial parts when that can be done without distortion of its meaning."  *People v. Ventimiglia*, 52 N.Y.2d 350, 362 (1981).  However,

---

[11]  *People v. Molineux*, 168 N.Y. 264, 294 (1901) ("Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial.").

"there is no requirement that such inquiry or ruling occur before trial commences." *People v. Small*, 12 N.Y.3d 732, 733 (2009). Accordingly, the prosecutors' disclosure of the Queens County Statement and the Trial Court's ruling were not untimely, thereby defeating any claim that Petitioner's trial counsel was ineffective for failing to challenge the timeliness of the Queens County Statement's disclosure by prosecutors or the timeliness of the *Molineaux* ruling by the Trial Court, and any claim that appellate counsel was ineffective for failing to make the preceding argument for ineffective assistance of trial counsel.

The Court is not persuaded by Petitioner's claim that the timing of prosecutors' disclosure of the Queens County Statement and of the Trial Court's *Molineaux* ruling interfered with his trial counsel's ability to properly advise him about pretrial plea offers the Trial Court made to Petitioner. On August 3, 2011, the pretrial judge offered Petitioner the opportunity to plead guilty on that day in exchange for a sentence of five years of incarceration. (Direct App. R. 2158; *id.* at 2633–34.) On August 11, 2011 — after hearing the evidence at the suppression hearing — the pretrial judge withdrew the earlier offer and instead offered Petitioner the opportunity to plead guilty in exchange for a sentence of seven years of incarceration. (*Id.* at 2634.) Prosecutors did not make their *Molineaux* application — which revealed the Queens County Statement — until January 13, 2012. (*Id.* at 2658.)

The fact that Petitioner's trial counsel did not learn about the Queens County Statement until after counseling Petitioner about the pretrial judge's plea offers does not amount to ineffective assistance. Courts analyzing claims of ineffective assistance should "evaluate [the reasonableness of counsel's] conduct from counsel's perspective at the time" of the allegedly unreasonable action or inaction. *Bell v. Cone*, 535 U.S. 685, 698 (2002). When advising a criminal defendant concerning a plea offer, counsel is not ineffective merely because counsel's

advice does not incorporate information about which counsel could not know.  *See Raysor v. United States*, No. 03-CV-5418, 2013 WL 9680122, at *10 (E.D.N.Y. Apr. 5, 2013) (finding that counsel's advice concerning a plea offer "fell well within the wide range of objectively reasonable professional assistance" even though "[a]t the time of the plea offer, [counsel] and petitioner had not encountered any damning evidence . . . both because discovery was incomplete and because the government planned to rely on cooperating witnesses about whom [counsel] lacked any information, and whose credibility [counsel] could not predict."), *report and recommendation adopted*, 2014 WL 4658972 (E.D.N.Y. Sept. 17, 2014).

Petitioner's trial counsel did not know about the Queens County Statement at the time he advised Petitioner about the pretrial judge's plea offers because prosecutors had not yet disclosed the Queens County Statement.  Counsel cannot be expected to advise Petitioner about the impact of evidence about which counsel does not know.  Because the Court reviews the reasonableness of counsel's advice concerning the plea offers in light of the information counsel knew and without regard to information counsel did not know, the Court finds that Petitioner's claim of ineffective assistance of counsel fails.  Petitioner's claim that appellate counsel provided ineffective assistance for failing to raise the preceding claim of ineffective assistance of trial counsel also fails.

### f.   Mid-trial evidentiary objections

Petitioner raises a host of alleged mid-trial evidentiary objections and argues that his trial counsel provided ineffective assistance by failing to lodge these objections at trial and that his appellate counsel provided ineffective assistance for failing to raise these issues on appeal.  None of Petitioner's arguments entitle him to federal *habeas* relief.

### i.   Hearsay objection

Petitioner first contends that the Trial Court admitted otherwise inadmissible hearsay. The Court disagrees.

New York law defines hearsay as "an out-of-court statement admitted for the truth of the matter asserted, and the hearsay rule generally prohibits the introduction of such statements at trial." *People v. Slade*, 37 N.Y.3d 127, 140 (2021) (citation omitted).

The first set of testimony that Petitioner contends constituted hearsay is the testimony of various witnesses using the first-person, plural pronoun "we" to describe their interactions with and observations of other, non-testifying individuals. However, a witness' testimony is not hearsay merely because it mentions or describes a non-testifying individual. *See, e.g.*, *People v. Myhand*, 991 N.Y.S.2d 222, 225 (App. Div. 2014).

The second set of testimony that Petitioner attacks as inadmissible hearsay is testimony reciting out-of-court discussions between co-conspirators in this case. This testimony does not violate the hearsay rule because under New York law, "[a] declaration by a coconspirator during the course and in furtherance of the conspiracy is admissible against another coconspirator as an exception to the hearsay rule." *People v. Caban*, 5 N.Y.3d 143, 148 (2005). Because New York law does not support Petitioner's arguments, the Court denies Petitioner relief on his hearsay claims.

### ii.   Confrontation clause

Petitioner also contends that the same testimony violates the Confrontation Clause because it deprives Petitioner of the opportunity to cross-examine the subjects of the witness' testimony. The Court disagrees.

The Confrontation Clause generally prohibits the use of testimonial statements against a criminal defendant unless that defendant has an opportunity to cross-examine the maker of the statement. *See Crawford v. Washington*, 541 U.S. 36, 68–69 (2004). Statements are not testimonial if made by a person who "would have had no reason to believe it would be used in a judicial proceeding." *United States v. Pike*, 292 F. App'x 108, 112 (2d Cir. 2008). Witnesses' testimony about their observations of and interactions with other, non-testifying witnesses are not covered by the Confrontation Clause because the witness' testimony does not repeat any out-of-court statements. *See Rivera v. Kaplan*, No. 17-CV-2257, 2020 WL 5550047, at *18 (S.D.N.Y. July 20, 2020) ("The Confrontation Clause only applies to out-of-court 'statements,' not to trial testimony describing out-of-court conduct not intended as an assertion. (citing Fed. R. Evid. 801(a))), *report and recommendation adopted*, 2022 WL 3572880 (S.D.N.Y. Aug. 19, 2022).

To the extent that Petitioner argues that the Confrontation Clause prohibited certain out-of-court statements between co-conspirators in this case, these statements were not testimonial because the individuals involved were not expecting their statements to be used as a substitute for live testimony in a later criminal prosecution. The Court therefore denies Petitioner relief on his Confrontation Clause claims.

### iii.   Leading questions

Petitioner next contends that the Trial Court improperly permitted prosecutors to ask several leading questions. This claim fails for two reasons. First, New York law does not outright prohibit leading questions but instead gives the Trial Court discretion to permit or deny leading questions. *See, e.g.*, *People v. Owens*, 52 N.Y.S.3d 790, 792 (App. Div. 2017). Second, even if prosecutors did improperly ask leading questions, any error is harmless because of the likelihood that a rephrased question would have cured the error and elicited the same testimony.

*See United States v. Donaldson*, 577 F. App'x 63, 67 (2d Cir. 2014) (finding no ineffective assistance because "objection likely would not have prevented admission of the resulting testimony, either because the district court would have permitted the question to be answered or because the prosecution would have rephrased the question" (citation omitted)); *Flores v. Keane*, 211 F. Supp. 2d 426, 441 (S.D.N.Y. 2001).

In sum, none of Petitioner's evidentiary objections entitle him to federal *habeas* relief. Because these evidentiary objections would not have succeeded, neither Petitioner's trial nor appellate counsel could have been ineffective for having failed to raise them.

### g.   Cell phone records

At trial, prosecutors introduced various records of cell phone providers Sprint Nextel and T-Mobile which linked various cell phones to Petitioner and his co-defendants and to the robbery itself.  Petitioner argues that these records were admitted in violation of New York state evidence law and the Confrontation Clause of the Sixth Amendment.  The Court denies Petitioner relief on both claims.

### i.   State evidence law

Petitioner first alleges that the cell phone company records were admitted in violation of state law.  The Court disagrees because the records qualified for New York's business records exemption to the hearsay rule.

New York law allows for the admission into evidence of "[a]ny writing or record . . . made as a memorandum or record of any act, transaction, occurrence or event," as "proof of that act, transaction, occurrence or event" so long as the writing or record "was made in the regular course of any business and that it was the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter."  N.Y. Civ.

Prac. L. & R. § 4518(a); *People v. Patterson*, 28 N.Y.3d 544, 550 (2016).  This provision is applicable in criminal trials.  *People v. Ortega*, 15 N.Y.3d 610, 615–18 (2010) (citing CPL § 60.10).  New York courts routinely admit the records of cell phone providers under the hearsay exemption for business records.  *See People v. Lanham*, 113 N.Y.S.3d 119, 122 (App. Div. 2019); *People v. Bonhomme*, 925 N.Y.S.2d 157, 159 (App. Div. 2011).  Even information "contained within business records" of a cell phone provider but not qualifying for the business records exemption may nonetheless qualify for admission into evidence if admitted for some nonhearsay purpose: for instance, "subscriber information" admitted "to show that the account had some connection to defendant — regardless of how tenuous."  *Patterson*, 28 N.Y.3d at 552.

The cell phone records of Sprint Nextel met these requirements.  A Sprint Nextel representative testified that the company maintains subscriber records — information about an account holder, the services that the company provides for the account, and the equipment associated with the account — in the regular course of its business and that the company creates these subscriber records at the time the account is set up or at the point of sale.  (Direct App. R. 3608.)  Representatives from both Sprint Nextel and T-Mobile testified that each company maintains call detail records — information about outgoing and incoming calls and text messages — in the regular course of their businesses and that each company creates these records at the time of the call or text.  (*Id.* at 3609–10, 3666, 3668–69.)  The two companies' representatives testified for each subscriber record and call detail record entered into evidence that Sprint Nextel and T-Mobile kept that subscriber record in the regular course of business and that it was Sprint Nextel's regular course of business to keep such records.  (*Id.* at 3613, 3618, 3625, 3630, 3637, 3656, 3668–69.)

The cell phone records of both companies met the requirements to be admitted as business records. *See Bonhomme*, 925 N.Y.S.2d at 159 ("The Supreme Court properly admitted the defendant's cell phone records through the testimony of the Sprint Nextel records custodian, who testified that she was familiar with the record-keeping practices of the company, that the defendant's cell phone records were made in the regular course of business, that it was the regular course of business to make the records, and that the records were made contemporaneously with incoming and outgoing phone calls.").

The records therefore did not violate New York state evidence law. Claims of ineffective assistance of counsel — both of trial and appellate counsel — based on such an argument must likewise fail.

### ii. Confrontation Clause

Petitioner also alleges that the cell phone company records were admitted in violation of the Confrontation Clause. The Court disagrees because cell phone company records are not testimonial and the Confrontation Clause therefore does not apply to such records.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend VI; *United States v. Reichberg*, 5 F.4th 233, 244 (2d Cir. 2021). Known as the Confrontation Clause, this constitutional provision generally prohibits the use of testimonial statements against a criminal defendant unless that defendant has an opportunity to cross-examine the maker of the statement. *See Crawford v. Washington*, 541 U.S. 36, 68–69 (2004); *see also Whorton v. Bockting*, 549 U.S. 406, 413 (2007) ("[O]ur opinion in *Crawford* . . . held that '[t]estimonial statements of witnesses absent from trial' are admissible 'only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness].'" (quoting *Crawford*, 541 U.S. at 59)). Statements

are "testimonial" when their "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." *Ohio v. Clark*, 576 U.S. 237, 244 (2015) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). "[W]hen a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the [statement]' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the [statement] occurs." *Michigan v. Bryant*, 562 U.S. 344, 370 (2011).

An out-of-court statement does not acquire a testimonial character merely because the statement will be useful in a later criminal prosecution. For instance, a domestic violence victim reporting an ongoing assault to a 911 dispatcher most likely makes her statements for the purpose of ensuring her personal safety, even if her statements could later be useful to prosecute the batterer. *Davis*, 547 U.S. at 827–28. Likewise, a gunshot-wound victim who — immediately before being transported by ambulance to a hospital for medical treatment — tells police about the circumstances of his shooting (including the identity of the shooter and the location of the shooting) most likely does so to assist police in apprehending a gunman on the loose, even if his statements could assist a subsequent prosecution of the assailant. *Bryant*, 562 U.S. at 371–78. Similarly, a discussion between a three-year-old child and her preschool teachers about potential child abuse at the child's home most likely has the primary purpose of safeguarding the child from further abuse, even if those statements could support later criminal charges against the abuser. *Clark*, 576 U.S. at 246–49.

The Confrontation Clause can apply to documents produced outside of court. For instance, an affidavit of a state laboratory analyst, swearing that the analyst chemically tested a particular substance and found it to contain a prohibited narcotic, constitutes a testimonial

statement such that the affidavit may not be admitted into evidence absent an opportunity for the criminal defendant to cross-examine the analyst.  *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009).  These affidavits constitute testimonial statements because they "are incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" *id.* (quoting *Crawford*, 541 U.S. at 51), and because "the affidavits [were] 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" *id.* (quoting *Crawford*, 541 U.S. at 52).  A signed statement attesting to an analysis of the blood-alcohol content of a defendant's blood sample likewise qualifies as a testimonial statement to which the Confrontation Clause applies. *See Bullcoming v. New Mexico*, 564 U.S. 647, 663–65 (2011).  These statements are "'formalized' in a signed document," *id.* at 665 (quoting *Davis*, 547 U.S. at 837 n.2), which was "created solely for an 'evidentiary purpose' . . . [and] made in aid of a police investigation," *id.* at 664 (quoting *Melendez-Diaz*, 557 U.S. at 311).

However, not every such report generated outside of court will qualify as testimonial.  "In this Circuit, [courts] consider whether such a document was 'made with the primary purpose of creating a record for use at a later criminal trial.'"  *United States v. Grecco*, 728 F. App'x 32, 34 (2d Cir. 2019) (quoting *United States v. James*, 712 F.3d 79, 96 (2d Cir. 2013)).  For example, reports of DNA analysts may not qualify as testimonial, notwithstanding their usefulness in a criminal prosecution.  *See Williams v. Illinois*, 567 U.S. 50, 85 (2012) (plurality opinion).  A plurality of the Supreme Court has noted that "in many labs, numerous technicians work on each DNA profile.  When the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures."  *Id.* (citations omitted).  Given this primary purpose, these technicians' notes and

written materials concerning their preliminary role in the DNA analysis would not constitute

testimonial statements to which the Confrontation Clause applied.  *See Clark*, 576 U.S. at 244;

*Bryant*, 562 U.S. at 370.

None of the cell phone company records introduced at Petitioner's trial qualify as

testimonial.  Sprint Nextel maintains subscriber records "primarily for [the company] to know

who [its] customers are for billing purposes."  (Direct App. R. 3611.)  Sprint Nextel maintains

call detail records "for billing purposes[,] to make sure that the amount of minutes used is within

the negotiated amount that [the company] set[s] or established in [the company's] contract."  (*Id.*

at 3611.)  T-Mobile also maintains call detail records "for billing purposes."  (*Id.* at 3667.)  In

other words, none of these records exists for the primary purpose of creating evidence for use at

trial.  *See Garlick v. Lee*, 1 F.4th 122, 131 (2d Cir. 2021) ("While a document kept in the regular

course of business ordinarily may be admitted at trial despite its hearsay status, such a document

may not be admitted without confrontation if 'the regularly conducted business activity is the

production of evidence for use at trial.'" (quoting *Melendez-Diaz*, 557 U.S. at 321)).  *Compare*

*James*, 712 F.3d at 96 (holding that an autopsy report was not testimonial where it was not

prepared primarily to create a record for use at a criminal trial and where it was completed

"substantially before" any criminal investigation into the victim's death had begun); *and United*

*States v. Moseley*, 980 F.3d 9, 28 (2d Cir. 2020) (finding borrower complaints about the

defendant's business were created "to seek relief from the onerous terms of [the defendant's]

loans — not to provide evidence for eventual use in [the defendant's] prosecution"); *with*

*Garlick*, 1 F.4th at 134 (finding that admission of autopsy report violated Confrontation Clause

where report was a declaration or affirmation made to establish or prove a fact; as in *Melendez-*

*Diaz* and *Bullcoming*, "law enforcement provided seized evidence . . . to a state laboratory

required by law to assist in police investigations," the autopsy "was performed in aid of an active police investigation," and "the circumstances under which the autopsy report was created would lead any objective witness" to believe it would be available for use at a later trial).  The fact that prosecutors may find these records useful as evidence at trial does not change their primary purpose and therefore does not give the records a testimonial character.

Because the Sprint Nextel records and T-Mobile records are not testimonial, the Confrontation Clause does not apply to them and Petitioner's Confrontation Clause argument therefore fails.  So, too, must his related claims of ineffective assistance of trial counsel and ineffective assistance of appellate counsel.

### h.   Punishment for electing to proceed to trial

Petitioner argues that the trial judge handed down a harsh sentence because Petitioner chose to exercise his right to trial.  The Court disagrees.

Before the suppression hearing, the pretrial judge who presided over the suppression hearing told Petitioner to "think about the serious consequences of not taking the disposition" of entering a guilty plea in exchange for a lesser sentence, and that entering a guilty plea could "sav[e] maybe ten, fifteen years of your life."  (Direct App. R. 2158–59.)  Following the suppression hearing, the pretrial judge told Petitioner that he would "recommend to any Judge who is trying this case a certain sentence, and they will have to talk to me before the sentence is imposed, if you go to trial and lose."  (*Id.* at 2634.)  The pretrial judge also indicated that he believed that the evidence against Petitioner was substantial.  (*Id.* at 2633.)

A different judge presided over Petitioner's trial and sentenced Petitioner.  There is no evidence in the record that the trial and sentencing judge punished Petitioner at sentencing for exercising his right to go to trial.  The trial judge noted that any plea offers in the case — either

to Petitioner or to his co-defendants — came from other judges, not the trial judge.  (*Id.* at 2129.)
The trial judge also indicated that the jury's verdict rejected Petitioner's claim that he was an
"unwitting participant" in the charged crimes, and that the evidence at trial "has proven
[Petitioner] to be a thief, a schemer, and a coward."  (*Id.* at 2129.)  In explaining the sentence
imposed, the trial judge did not indicate that Petitioner was being punished for going to trial.
(*Id.*)  Likewise, the trial judge's explanation did not give any weight to the earlier comments or
views of the pretrial judge; in fact, the trial judge's explanation for sentence did not indicate that
the trial judge communicated in any way with the pretrial judge about Petitioner's case.  The
Court therefore denies Petitioner relief on his claim that the trial judge punished him for
exercising his right to insist on a trial rather than entering a guilty plea.

      **i.   Judicial bias**

      Petitioner argues that the trial judge exhibited bias against him.  The Court finds this
claim meritless.

      Petitioner alleges that several actions by the trial judge demonstrate bias against him.
First, the trial judge instructed Petitioner immediately before trial that he could enter a guilty plea
up until the start of trial, but that once trial began, the trial judge would not entertain any plea
bargains.  (*Id.* at 2685–88.)  Second, when prosecutors noted that police in Queens "do things
differently in the city than they do here" in Nassau County with regard to whether detectives
have suspects hand-write or type their statements, the trial judge replied, "[a]nd apparently don't
charge defendants who admit to the crimes obviously."  (*Id.* at 2675.)  Third, the trial judge and
Petitioner's counsel had a spirited discussion at trial outside the jury's presence about the proper
objection procedure, in which the trial judge described trial counsel as exhibiting "nearly
contemptible behavior" for "jumping out of [his] seat," excessively repeating the word objection,

"stomp[ing] [his] feet," and objecting in a manner reminiscent of "a five year old." (*Id.* at 3483–84.)  None of these incidents demonstrates judicial bias.

"[T]he Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). The relevant inquiry is "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias.'" *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 872, 881 (2009); *see also Rippo v. Baker*, 580 U.S. ---, ---, 137 S. Ct. 905, 907 (Mar. 6, 2017) (per curiam) (explaining that a petitioner need not "point[] to facts suggesting actual, subjective bias" and that courts should not ask whether a judge was actually biased but rather must ask "whether, considering all the circumstances alleged, the risk of bias was too high to be constitutionally tolerable").

First, the trial judge did not demonstrate the potential for bias by setting a deadline for plea bargains.  Setting and enforcing deadlines over the course of litigation does not amount to judicial bias.  *See Mecaj v. Barr*, 776 F. App'x 22, 24 (2d Cir. 2019) (applying this principle to immigration judges).

Second, the trial judge did not demonstrate bias by remarking that Queens police did not charge Petitioner.  The record reflects that at the time of the statement, Petitioner had not faced criminal charges for the robbery in Queens mentioned in the Queens County Statement. (DiGregorio Aff. ¶ 11, at 3978.)  "No bias can be interpreted from this remark which merely stated the truth . . . ." *Lebron v. Sanders*, No. 02-CV-6327, 2008 WL 793590, at *25 (S.D.N.Y. Mar. 25, 2008).

Finally, the trial judge's verbal exchange with defense counsel did not demonstrate judicial bias.  Judicial reprimands of defense counsel for the purpose of "conduct[ing] an orderly trial, supervis[ing] the conduct of attorneys, control[ling] the mode and order of interrogating witnesses and presentation of evidence, and keep[ing] the proceedings moving along in a reasonable manner" does not evidence judicial bias because "judges have [an] affirmative obligation to take corrective action in the face of a pattern of misconduct and contumacious behavior by counsel."  *United States v. Daidone*, 796 F. Supp. 715, 719 (E.D.N.Y. 1992), *aff'd*, 999 F.2d 537 (2d Cir. 1993); *see also United States v. Miller*, 807 F. App'x 90, 94 (2d Cir. 2020) (finding that district court admonishing defense counsel for making "same objection after repeatedly being overruled" did not deny the defendant a fair trial).

In sum, the trial judge displayed no evidence of bias or prejudice against Petitioner.  The Court therefore denies Petitioner relief on this claim.  The Court likewise finds meritless any claims of ineffective assistance of trial or appellate counsel derived from this claim of judicial bias.

### j.   Affirmative defense of inoperability of the firearm

Petitioner contends that the Trial Court should have charged the jury on the affirmative defense of inoperability of the firearm.[12]  Petitioner further argues that his trial counsel provided ineffective assistance for failing to properly request such an instruction and for failing to develop

---

[12]  Petitioner briefly mentions "lesser included offenses" in his sixth ground for relief. (Pet. 38–39.)  A review of this portion of the petition — construed liberally and interpreted to raise the strongest arguments it suggests, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) — suggests that Petitioner is discussing only the affirmative defense of inoperability, not the possibility of the Trial Court charging jurors on any lesser included offenses.

the record to support the defense, and appellate counsel provided ineffective assistance for failing to raise this claim on direct appeal.  None of these claims warrants federal *habeas* relief.

Petitioner faced charges of robbery in the first degree and burglary in the first degree. (Direct App. R. 2135–36.)  Both the robbery and burglary charges required prosecutors to prove that "[Petitioner] or another participant in the crime . . . display[ed] what appear[ed] to be a . . . firearm."  N.Y. Penal L. § 160.15(4) (robbery); *id.* § 140.30(4) (burglary).  Each statutory provision allows for an "affirmative defense that such . . . firearm was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged."  *Id.* § 160.15(4) (robbery); *id.* § 140.30(4) (burglary).  Petitioner would have had to prove this affirmative defense by a preponderance of the evidence.  *See People v. Howard*, 22 N.Y.3d 388, 398 (2013).

The Trial Court did not err by failing to instruct the jury concerning the affirmative defense of inoperability because "'[t]here is no reasonable view of the evidence that would allow the jury to conclude, without resorting to speculation, that [Petitioner or another participant in the crime]' displayed a weapon that was inoperable or unloaded."  *People v. Peterkin*, 932 N.Y.S.2d 639, 642 (App. Div. 2011) (quoting *People v. Taylor*, 921 N.Y.S.2d 455, 456 (App. Div. 2011)). Although the evidence at trial showed that participants in the crime displayed guns, (*see, e.g.*, Trial Tr. 645, Docket Entry 14-2, at 3302), the evidence was insufficient to show that the guns were inoperable.  Petitioner points to testimony from one of the victims who heard the gun make a "click" sound.  (Direct App. R. 3186.)  The "click" sound is insufficient, without more, to prevail on this defense.  *See People v. Hill*, 752 N.Y.S.2d 454, 454–55 (App. Div. 2002).  In addition, a criminal defendant is unlikely to succeed on this defense when police never recover the gun in order to test fire it, and a gun was not recovered and presented at trial.  (Direct App. R.

3700, Docket Entry No. 14-2, at 3700 (noting that the guns "were not recovered and presented at trial"); *Brown v. Walker*, 275 F. Supp. 2d 343, 352 (E.D.N.Y. 2003); *cf. People v. Davis*, 849 N.Y.S.2d 257, 259 (App. Div. 2008) ("Under the circumstances under which the crime was committed, the fact that the police were unable to recover a weapon did not, either by itself or when taken together with the other evidence, warrant submission of [the inoperability] defense."). Because Petitioner's only evidence of inoperability is the testimony that the gun made a "click" sound, and because no gun was recovered, without more, Petitioner could not have succeeded with the inoperability defense at trial, and therefore, the Trial Court did not err by failing to charge the jury on the affirmative defense of inoperability.

Petitioner further contends that his trial counsel provided ineffective assistance by failing to adduce at trial the evidence necessary to support the affirmative defense of inoperability and that his appellate counsel provided ineffective assistance by failing to raise this issue. In support, Petitioner points to various statements his co-defendants made to police, including one who told a police officer that "I think the gun is fake." (Nassau Cnty. Police Dep't Crime Rpt. 532, Docket Entry No. 6-1.) This claim fails because Petitioner's co-defendants were not a viable means of providing evidentiary support for the inoperability defense. Although trial counsel could have attempted to support an inoperability defense by calling Petitioner's co-defendants as witnesses to have them testify as to whether the gun met the statutory operability requirements, such an effort would have been fruitless because each co-defendant likely would have exercised his or her Fifth Amendment right not to incriminate him or herself. *See United States v. O'Connor*, 650 F.3d 839, 861 (2d Cir. 2011) (holding that there was "no reason to believe that [the co-defendant] would waive his Fifth Amendment privilege in order to testify" on the defendant's behalf); *United States v. Schlegel*, No. 06-CR-550, 2009 WL 3837305, at *2

(E.D.N.Y. 2009) (noting that a co-defendant was unlikely to choose to testify on the defendant's behalf because self-incrimination concerns could continue even after the co-defendant's separate trial).

In addition, although Petitioner's trial counsel could have attempted to support an inoperability defense by calling the police officers to whom the co-defendants made these statements, and have those officers — rather than the co-defendants themselves — testify about the co-defendants' statements, the police officers would have been unable to testify to the co-defendants' statements because of New York's prohibition on hearsay.  *See People v. Gilliard*, 46 N.Y.S.3d 646, 646–47 (App. Div. 2017) (holding that "the defendant's request to admit into evidence the codefendant's out-of-court statement to a police officer as a declaration against penal interest" was "properly excluded as inadmissible hearsay"").

In sum, trial counsel faced no viable means of asserting an inoperability defense. Counsel cannot have been ineffective for having failed to pursue this hopeless cause.  Similarly, appellate counsel cannot have been ineffective for failing to raise this meritless issue of ineffective assistance of trial counsel.

### k.   Double Jeopardy Clause

Petitioner contends that the indictment against him contained multiplicitous charges, and further contends that his trial and appellate counsel provided ineffective assistance for failing to raise these points.  This claim does not entitle Petitioner to federal *habeas* relief.

A claim that an indictment contains "multiplicitous" charges constitutes a claim under the Double Jeopardy Clause of the Fifth Amendment.  *See United States v. Ogbay*, 296 F. App'x 198, 150 (2d Cir. 2008) ("The doctrine of multiplicity is based upon the double jeopardy clause of the Fifth Amendment, which assures that the court does not exceed its legislative authorization by

imposing multiple punishments for the same offense." (quoting *United States v. Harris*, 79 F.3d 223, 231 (2d Cir. 1996))); *Serrano v. Kirkpatrick*, No. 11-CV-2825, 2013 WL 3226849, at *13 (S.D.N.Y. June 25, 2013); *Lee v. Ricks*, 388 F. Supp. 2d 141, 153 (W.D.N.Y. 2005). "The Double Jeopardy Clause 'confers its protections in three different situations — where there is a second prosecution for the same offense after acquittal of that offense; where there is a second prosecution for the same offense after conviction of the offense; and where there are multiple punishments for the same offense.'" *United States v. Vanhoesen*, 366 F. App'x 264, 266 (2d Cir. 2010) (quoting *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003)). None of those three situations occurred in this case.

The first two situations do not apply for the same reason: Petitioner was prosecuted *simultaneously* for two counts of robbery in the first degree and two counts of burglary in the first degree, and was acquitted and convicted of one count of each charge. (Direct App. R. 3834–35.) Therefore, Petitioner was not prosecuted for any of the charges for which he was acquitted *after* the acquittal. Likewise, Petitioner was not prosecuted for any of the charges for which he was convicted *after* the conviction. The Double Jeopardy Clause does not prohibit simultaneous *prosecution* for the same offense. *See United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006).

What the Double Jeopardy Clause *does* prohibit is the third situation: if a criminal defendant is simultaneously prosecuted for multiple charges constituting the same offense, that defendant may not suffer *punishment* for all such charges. *See Josephberg*, 459 F.3d at 355 ("If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts."). Petitioner, however, did not suffer multiple

punishments for the same offenses: he was acquitted of one count of burglary in the first degree and one count of robbery in the first degree, and therefore did not suffer *any* punishment for these charges.  (Direct App. R. 3834–35.)  When a criminal defendant is "acquitted of one of the two putatively multiplicitous charges, he is not being punished twice for the same crime," and therefore "suffer[s] no harm."  *Skinner v. Duncan*, No. 02-CV-3430, 2003 WL 21822437, at *4 (E.D.N.Y. July 17, 2003).

Because Petitioner suffered no double jeopardy violation, this claim does not entitle Petitioner to federal *habeas* relief.  For the same reason, neither Petitioner's trial nor appellate counsel provided ineffective assistance in connection with failing to raise a double jeopardy violation.

### l.    Ineffective assistance of appellate counsel

Petitioner contends that his appellate[13] counsel provided ineffective assistance for failing to raise the issues discussed in this petition.  As explained above, none of the issues in this petition entitle Petitioner to federal *habeas* relief.  Petitioner's appellate counsel could not have

---

[13]  As discussed in the sections above, Petitioner also raises multiple claims of ineffective assistance of trial counsel.  In addition to failing on their merits, each of these claims is procedurally defaulted.  Petitioner raised these claims in a post-conviction motion.  (Pet'r's Post-Conviction Mot. 731, Docket Entry No. 11-1.)  The Trial Court rejected them pursuant to New York Criminal Procedure Law § 440.10(2)(c) because Petitioner failed to raise the claims on direct appeal.  (Trial Ct.'s Post-Conviction Order 1214, Docket Entry No. 11-6.)  This statutory provision constitutes an independent and adequate state procedural ground sufficient to bar federal habeas review.  *See Hudyih v. Smith*, 684 F. App'x 99, 100 (2d Cir. 2017).  Accordingly, Petitioner's claims of ineffective assistance of trial counsel not only fail on their merits, but also fail due to the procedural default.  *See, e.g.*, *Jackson v. Conway*, 763 F.3d 115, 143–44 (rejecting a claim as procedurally defaulted where the state court denied the claim on account of section 440.10(2)(c)); *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) ("We conclude that the district court erred in holding that the state court's application of section 440.10(2)(c) did not constitute an adequate state procedural bar to [the petitioner's] federal habeas petition."); *Hunt v. Artus*, No. 16-CV-4665, 2020 WL 7643128, at *5 (E.D.N.Y. Dec. 23, 2020) (finding section 440.10(2)(c) to be an independent and adequate state procedural bar).

been ineffective for failing to raise these issues.  Accordingly, this final claim does not entitle Petitioner to federal *habeas* relief.  *See United States v. Regalado*, 518 F.3d 143, 149 n.3 (2d Cir. 2008) ("[F]ailure to make a meritless argument does not amount to ineffective assistance.").

### III.   Certificate of appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a) Gov'g Sec. 2254 Cases in the U.S. Dist. Cts.  Having dismissed the petition for a writ of habeas corpus, the Court issues a certificate of appealability on all matters discussed in this opinion.

The Court must issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This means that a habeas petitioner must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

"This threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'"  *Buck v. Davis*, 580 U.S. ---, ---, 137 S. Ct. 759, 773 (Feb. 22, 2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)).  "Obtaining a certificate of appealability 'does not require a showing that the appeal will succeed,' and '[courts] should not decline the application . . . merely because [they] believe[] the applicant will not demonstrate an entitlement to relief.'"  *Welch v. United States*, 578 U.S. 120, 127 (2016) (quoting *Miller-El*, 537 U.S. at 337).  In fact, a certificate of appealability may issue even if "every jurist of reason might agree, after the [certificate of appealability] has been granted and

the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 337–38.

The Court grants a certificate of appealability on all issues relating to Respondent's motion to dismiss and all issues raised in the petition.  As to the motion to dismiss, the statute of limitations matters concern disputes of fact which reasonable jurists might debate different ways to resolve.  As to the petition's merits, each claim raises several issues, any of which might warrant discussion among judges of reason.  While the Court expects that no other judicial officer would grant *habeas* relief in this case, the matters raised are at least debatable, which is all that is required for a certificate of appealability to issue.

**IV.  Conclusion**

Because Petitioner is not entitled to equitable tolling, the petition is untimely.  The Court grants Respondents' motion to dismiss the petition.  Moreover, even if timely, the Court nevertheless denies the petition on its merits because none of Petitioner's claims entitle him to federal *habeas* relief.  The Court grants a certificate of appealability on all issues raised in both Respondents' motion to dismiss and in the petition.

Dated:  September 16, 2022
        Brooklyn, New York

                            SO ORDERED:


                            s/ MKB
                            _____
                            MARGO K. BRODIE
                            United States District Judge

47